IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THERESA GONZALES,

        Plaintiff,

vs.                                          No. CIV 98-669 JC/LFG

KENNETH S. APFEL, Commissioner,
Social Security Administration,

        Defendant.

**MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION**[1]

Plaintiff Theresa Gonzales ("Gonzales") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Gonzales was not eligible for supplemental security income ("SSI"). Gonzales moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.

Gonzales was born on June 27, 1952 and was 43 years old at the time of the administrative hearing. She completed the twelfth grade in school and attended Albuquerque Technical Vocational Institute. Her past work experience is as a carpenter, casino "change girl," and cashier at a service station and a video store. She alleges that she has been unable to work since July 26, 1994, when she was injured in an automobile accident. Complaints include back pain, headaches, dizziness, and depression.

---

[1] Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

Gonzales' application was denied at the initial and reconsideration stages, and she sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on June 19, 1996. In a decision dated July 26, 1996, the ALJ found that Gonzales was not disabled within the meaning of the Social Security Act and denied the benefit request.[2] Gonzales challenged this determination to the Appeals Council which denied her request for review on April 28, 1998. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[2] The decision of the ALJ is attached to this Analysis and Recommended Disposition.

[3] 20 C.F.R. § 416.920(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4] 20 C.F.R. § 416.920(a)-(f)(1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5] 20 C.F.R. § 416.920(b)(1999).

[6] 20 C.F.R. § 416.920(c)(1999).

1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11] In the case at bar, the ALJ made his dispositive determination of non-disability at step four of the sequential evaluation.

Gonzales contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did not apply the correct legal standards.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient

---

[7] 20 C.F.R. § 416.920(d) (1999). If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[8] 20 C.F.R. § 416.920(e) (1999).

[9] The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 416.967 (1999).

[10] 20 C.F.R. § 416.920(f) (1999).

[11] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse, at 789. In Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

Gonzales claims the ALJ erred in failing to assess her mental functioning, failing to determine the demands of her past work, and failing to develop the record regarding her mental functioning.

## **Discussion**

The ALJ made his finding of nondisability at step four of the analysis. He held that Gonzales has the RFC for at least a full range of light work and that she is capable of returning to her past work as a cashier. However, the ALJ failed to analyze the demands of Gonzales's past work and failed to adequately develop the record as to her possible mental impairment, and the case must therefore be remanded for further development.

Step four of the sequential analysis consists of three phases: (1) the ALJ must evaluate the claimant's physical and mental RFC; (2) he must determine the physical and mental demands of the claimant's past relevant work; and (3) he must determine whether the claimant has the ability to meet the job demands as determined in phase two, given the physical and mental limitations found in phase

one. Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).  In the present case, the ALJ did a thorough review of the medical records, but he failed in phase one to adequately address Gonzales' allegations of mental impairment and its effect on her RFC, and in phase two, he did not properly analyze the physical and mental demands of her past relevant work.  The phase three finding, that Gonzales has the ability to meet the job demands of cashier work despite her limitations, was therefore based on faulty premises.

### Phase One:  Physical and Mental RFC

The ALJ found that Gonzales has a severe physical impairment consisting of soft tissue injuries to the back and neck, and that she has the physical ability to do a full range of light work.  Gonzales does not challenge the ALJ's analysis of her physical impairments and indeed the record supports a finding that Gonzales is physically capable of doing light work.  However, Gonzales argues that the ALJ overlooked her mental impairments in making the RFC finding.  The Court agrees.  At step four, the ALJ is required to examine whether the claimant's physical and mental impairments prevent her from continuing her past relevant work.  Andrade v. Secretary of Health & Human Svcs., 985 F.2d 1045, 1047 (10th Cir. 1993).

> When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Secretary must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a [§ 416.920a for SSI applicants] and the Listing of Impairments and document the procedure accordingly . . . Documentation is made by completing a PRT form, which the ALJ must attach to his written decision.  The record must contain substantial competent evidence to support the conclusions reached on the PRT form, and if the ALJ prepares the form himself, he must discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.

Winfrey, at 1024 (internal punctuation omitted).

The ALJ in this case did not follow the procedures outlined in § 416.920a, in spite of evidence on the record of a mental impairment which prevents the claimant from working. Although the record is rather sparse, there is sufficient evidence that Gonzales is suffering from depression to trigger the ALJ's duty to further develop the record before making the RFC finding.

Gonzales was injured in an automobile accident on July 26, 1994. (Transcript at 60; hereafter referred in the form, "Tr. 60"). She sustained injuries to her back and neck in the accident and has continued to experience back, neck, and shoulder pain and stiffness, as well as headaches and dizziness, since that time. She was not hospitalized at the time of the accident. On August 5, 1994, she was examined by Dr. Richard R. Weber, D.O., who took X-rays. He noted her complaints of pain, dizziness, and headaches "that are present on a fairly regular basis." (Tr. 87). He concluded that she did not have a fracture or dislocation in the back, nor did she show any signs of radiculopathy.[12] (Tr. 88). He diagnosed a soft tissue injury to the neck and mid to lower back areas, and recommended a conservative program of care including physical or chiropractic therapy, and the application of heat or ice to the affected areas as well as over-the-counter Ibuprofen for pain. (Tr. 89).

Gonzales saw a chiropractor and massage therapist between August and December 1994, but these visits provided little, if any, relief. (Tr. 92-104). The first mention of depression found in the record occurs in May 1995, when Gonzales filled out a checklist of symptoms in connection with her visit to a new chiropractor. She stated that, among other ailments, she was suffering from nervous

---

[12]Radiculopathy: disease of the nerve roots. Dorland's Illustrated Medical Dictionary 1109 (26th ed. 1981).

stomach, general nervousness, lack of sleep, and depression. (Tr. 112). In her disability report of July 9, 1995, she noted that she is "scared of driving now" and does not have much social contact. (Tr. 63). In that same month, she noted in a Daily Activities form that she has trouble sleeping at night because of back pain and depression. (Tr. 68). She also stated she "can't enjoy doing anything," and the pain makes her miserable all the time, and depressed. (Tr. 71). Two third-party reports of her daily activities, submitted by her sister and a friend, confirm that Gonzales no longer engages in social activities, does not leave the house, drives only to doctor's appointments, and has appropriate grooming habits only when she's "in the mood," or "if and when she gets out of bed." (Tr. 75-80). Her sister added that Gonzales is depressed, can't concentrate and is "grouchy"; she concluded that, "I know Theresa was very active before the accident. She was very pleasant to get along with. She was on-the-go all the time. She paid her bills on time. She played with her grandkids. She loved life. Since the accident, it's been totally opposite." (Tr. 77).

 By November 7, 1995, Claimant reported that she still suffered from fear of driving, that she had "no desire to go out," that she was doing "less and less" in the way of daily activities, and that "I still stay in bed and don't do anything." (Tr. 83). Later that month, Gonzales was examined by Dr. Daniel G. Shibuya, M.D., a neurologist. Dr. Shibuya noted that Gonzales complained of extreme pain in her back and head – "10 out of 10" in severity – but that she appeared only to be in mild distress at times. The physical findings revealed nothing out of the ordinary, and his diagnosis was of "post traumatic syndrome" which he felt would resolve in two to four months. He prescribed "Amitriptyline therapy for headaches and back pain prophylaxis," as well as a physical therapy program and cessation of smoking. (Tr. 120).

 Amitriptyline is also known as Elavil. It is listed in the Physician's Desk Reference (53d ed.

1999) as a tricyclic antidepressant drug, intended for the relief of symptoms of depression; there is no mention in PDR of Amitriptyline being used for pain relief. Gonzales testified at the hearing that the doctor who gave her Amitriptyline said it would help her sleep and help with her depression. (Tr. 141-42). Although he does not say so directly, the implication from Dr. Shibuya's examination and report is that Gonzales had not recovered from her physical injuries, at a rate that should have been expected, due to interference from a psychological state of depression. His remarks that she complains of severe pain "but appears only in mild distress," his diagnosis of "post traumatic syndrome," and his prescription of Amitriptyline indicate that Gonzales was in need of treatment for a mental impairment at this time.

From December 1995 to February 1996, Gonzales was treated by Dr. David C. Leech, D.O. Dr. Leech's diagnosis was "multiple level somatic dysfunction. Probably fibromyalgia developing from sleep deprivation secondary to the accident." (Tr. 121). He prescribed a increased dose of Amitriptyline. "Somatoform disorders" are described in the Merck Manual of Diagnosis and Therapy 1508 (17th ed. 1999) as "a group of psychiatric disorders characterized by physical symptoms that suggest but are not fully explained by a physical disorder and that cause significant distress or interfere with social, occupational, or other functioning." "Fibromyalgia" is described in the Merck Manual (at 481) as "a group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures."

> Primary fibromyalgia syndrome (PFS) is a generalized, idiopathic form that is likely to occur in healthy young or middle-aged women who tend to be stressed, tense, depressed, anxious, and striving ... A minority of cases may be associated with psychophysiologic abnormality. Symptoms can be exacerbated by environmental or emotional stress or by an uncaring physician who gives the patient the message that it is 'all in the head.'

Treatment includes reassurance, stretching exercises, aerobic exercises, improved sleep, applications of heat and massage, and low-dose tricyclic antidepressants. Merck Manual, at 481-82.

In March 1996, Gonzales noted in her "Statement When Request for Hearing is Filed" that the pain was getting worse, that it was "more constant," and that she felt "very depressed." She stated that she did not drive and did not have any hobbies. (Tr. 85). Under "medications," she listed Amitriptyline (Tr. 86), although by June 1996, she stated on another Social Security form that she was no longer taking any prescription medications. (Tr. 123).

At the hearing on June 19, 1996, Gonzales testified to her symptoms of depression. She stated that sometimes two or three days go by and "I don't even wash my face . . . I just don't feel like doing anything." (Tr. 139). She stated that she has trouble sleeping because of depression, that she doesn't go anywhere, stays in bed most of the day and stays "locked up in my room" for days. (Tr. 139, 146). She reiterated her fear of driving and said she was "scared to be out in the world" (Tr. 140-41) and said she cries a lot and has suffered loss of memory and concentration. (Tr. 143-44).

At the hearing, Gonzales' representative requested that the ALJ order a consultative examination to assess the allegations of depression, in light of evidence on the record of somatic complaints and the fact that Gonzales' doctor prescribed Amitriptyline, at least in part, for depression. The ALJ refused to order a consultative examination, stating, "I've been getting my hands slapped lately for doing that sort of thing . . . There isn't enough documentation to justify a [consultative examination]."

The Court disagrees. While it is true that Gonzales has never been hospitalized for

psychological problems, and the physician who diagnosed "somatic dysfunction" and prescribed an antidepressant only treated her for four months, there is, nevertheless, significant evidence on the record of a mental impairment, as is noted above. The existence of a diagnosis of depression from a treating physician requires the ALJ to develop the record concerning depression. Carter v. Chater, 73 F.3d 1019, 1022 (10th Cir. 1996). Gonzales is consistent throughout the record in describing her symptoms of depression, and her complaints are confirmed by third-party reports. Gonzales allege depression when she initially sought SSI benefits, but this is not necessary where the record otherwise supports a finding of mental impairment. Andrade, at 1049. "While the claimant retains the burden of showing that he is disabled at step four, the ALJ has a duty 'of inquiry and factual development.'" Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994).

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.920a. Cruse v. U.S. Dept. of Health & Human Svcs., 49 F.3d 614, 617 (10th Cir. 1995). That procedure requires that the Commissioner must determine the presence or absence of certain medical findings especially relevant to the ability to work (the "Part A" criteria), and then evaluate the degree of functional loss resulting from the impairment (using the "Part B" criteria). Finally, the Commissioner must record her conclusions by preparing a standard document called a Psychiatric Review Technique Form ("PRT" form). At the ALJ hearing level, the ALJ may complete the PRT form, with or without the assistance of a medical advisor, but he must attach the form to his written decision, Id., and must discuss in the opinion the evidence he considered in reaching the conclusions expressed on the form. Washington, at 1442.

No one considering Gonzales's case at any level of these proceedings has completed a PRT

form, in spite of evidence on the record that she suffers from a somatic disorder and depression. Although the ALJ is not required to order a consultative examination, that would have been appropriate in this case. At the least, the ALJ should have prepared a PRT form, preferably with the assistance of a mental health professional, as a necessary part of evaluating whether Gonzales' ability to work is affected by any mental impairment she may have. Andrade, at 1050 ("based on the particular circumstances of this case, the ALJ abused the discretion afforded to him by the regulations . . . by assessing claimant's residual functional capacity without making any effort to obtain the assistance of a mental health professional").

In this connection, the ALJ should also reconsider his finding of Gonzales' credibility in light of record evidence that she is suffering from a somatic complaint. "[T]he mere fact that Mr. Smith's pain has a somatic component does not justify a finding that his complaint of pain is not credible." Smith v. Apfel, 141 F.3d 1185 (Table, text in Westlaw), No. 97-7079, 1998 WL 105935, at *3 (10th Cir. Mar. 11, 1998), *citing* Easter v. Bowen, 867 F.2d 1128, 1129-30 (8th Cir. 1989) (holding somatic contributions to pain may be disabling in themselves).

> The ALJ's findings made no reference to Dr. Hickman's diagnosis of somatoform pain disorder, and did not consider whether Ms. Tolbert's exaggerated complaints were a manifestation of this disorder, affecting her perception of pain . . . Dr. Hickman's report is the only mental evaluation of Ms. Tolbert in the record, and we find no evidence in the record refuting any of his findings. Indeed, the observations in numerous medical reports that Ms. Tolbert overstates her problems may well be consistent with his diagnosis of somatoform pain disorder. The ALJ's failure to discuss or consider uncontroverted, probative evidence of disability requires us to reverse and remand for proper consideration of Ms. Tolbert's mental impairments.

Tolbert v. Chater, 107 F.3d 21 (Table, text in Westlaw), No. 96-5120, 1997 WL 57091, at *2, 3 (10th Cir. Feb. 11, 1997). The same is true in the present case.

Phase Two:  Demands of Plaintiff's Past Relevant Work

At step four, the claimant bears the burden of proving that she is unable to return to her past relevant work.  Andrade, at 1050.  However, at the second phase of the step four analysis, the ALJ must make findings regarding the physical and mental demands of claimant's past relevant work and, in order to do so, must obtain adequate factual information about those work demands which have a bearing on the medically established limitations:

> When the claimant has a mental impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

Winfrey, at 1024.

The ALJ did not make such findings in this case.  He noted in his opinion that Gonzales has worked in the past as a cashier, a maid, a casino "change girl," and a carpenter.  He found that her work as a cashier required light exertion, and "[i]n view of my finding that Claimant has the residual functional capacity to perform light work, I find that Claimant can return to work as a cashier and is therefore not disabled."  (Hearing Decision, at 9; Tr. 23).  This is insufficient.

> Even though the claimant has the burden of proving a disability, an ALJ still has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts . . .  Because he did not elicit any evidence from a vocational expert or refer to any accepted vocational manuals . . . in evaluating the requirements of claimant's past work, the ALJ had only claimant's testimony and the vocational form claimant filled out on which to rely.  Neither of these sources, however, provided information about the functional requirements at issue here.  [Internal punctuation omitted].

Butler v. U.S. Dept. of Health & Human Svcs, 9 F.3d 116 (Table, text in Westlaw), No. 93-6025,

1993 WL 425851, at *2 (10th Cir. Oct. 22, 1993).

At the least, the ALJ should have inquired at the hearing about the functional requirements of Gonzales' past work that would be relevant to any mental impairment she might have. Id. The ALJ did inquire briefly into the physical demands of Gonzales' past work as a cashier (Tr. 133-34), but his examination did not include any questions about the mental or psychological demands of that work. "The ALJ, here, did not elicit any evidence regarding the mental demands of plaintiff's past work as a barber or a custodian, and the record contained little of no evidence concerning the physical demands of those jobs." Washington, at 1442. The same is true in the present case. On remand, the ALJ must develop an adequate record with regard to the "stress level of any prior job," Henrie v. U.S. Dept. of Health & Human Svcs., 13 F.3d 359, 361 (10th Cir. 1993), as well as other specific functional requirements of Gonzales' past work.

Because the ALJ did not appropriately complete phases one and two, he was unable to make the necessary findings at phase three about Gonzales' ability to meet the mental demands of her past relevant work. *See*, Winfrey, at 1024-25. The Court does not direct any particular result but holds that, on remand, the ALJ must re-evaluate his findings in phase three of step four, in light of the reconsideration to be done in phases one and two.

## Recommended Disposition

That Gonzales' Motion to Reverse [Doc. 9] be granted and the case remanded to the Commissioner for further consideration of claimant's alleged mental impairment and her capacity to return to her previous occupation, in accordance with this opinion.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge